Ladies and gentlemen, Judge Owens and I are particularly pleased today to be joined by Judge Battaglia of the Southern District of California, which leaves me between two San Diego residents, the odd man out on the panel, but we're very happy to have you here, Tony. Western Watersheds Project v. United States is submitted on the briefs and we'll hear our argument now, United States v. Lopez-Rivas. Counsel? Good morning. My name is Josh Hamilton. I represent Mr. Lopez-Rivas. If I could, I'd like to reserve about six minutes for rebuttal. Manage your own time. I will. Thank you. This case is the culmination of a long-term multi-agency, multi-state investigation into suspected members of the Sinaloa drug cartel operating here in the United States. The investigation relied heavily, in fact centered upon directly, the efforts of a top echelon criminal informant by the name of Joe Almada. In connection with his testimony in this case, he was paid, I believe, $250,000 by the federal government. Prior to trial, the prosecution had disclosed, or at least at the time represented, full disclosure of his past and history as an informant for the government, both state and federal. Dating as far back, I believe, to the mid to late 1980s, the defense team went forward with the trial preparation, and particularly the formulation of developing cross-examination of particular witnesses, and more importantly, developing the theory of the case, if you will, based upon that information. Then, in the middle of trial, with the informant on the stand, he reveals to, apparently, the surprise of many people in the courtroom that, in fact, he had also been an informant for the DEA for several years, from, I believe, 2005 to 2008. Not only that, he was paid. I believe he testified before a grand jury, although that is murky. I believe he sought and potentially obtained immigration benefits for his wife, although that is murky. The point is, none of this information was disclosed, and none of it was known to the defense. But then the trial judge ordered a recess, ordered production of the documents, and there was opportunity afforded to review the documents before cross-examination. So, what's the problem? That's not entirely correct. The way, what happened was, initially the government said, we don't know what he's talking about. That's probably not true. He just used a figure of speech. The figure being, I was signed up as a confidential informant, in quotes. First, the government said, we have no information on that. The district court initially seemed like it would declare a mistrial. Then, another more seasoned AUSA came into the courtroom and said, I've talked to the DEA. He may have spoken with them, but he was not signed up as an informant. We're still figuring it out. The district court then tipped its hand that it may be declaring a mistrial. AUSA came back into the courtroom and said, I just got off the phone with general counsel in Washington, or it may have been Phoenix, general counsel for DEA. He was, in fact, signed up as an informant. I'm trying to get those records. Those records were eventually, the court certainly had them. They were given to the defense, heavily redacted. I think it's important. We were never allowed to actually take the documents. We had to leave them with the prosecutor at the end of the day. We did see some of it, albeit not all of it. I think something that's important is that this may just be the tip of the iceberg. The point is, the government did not discharge its duty under Brady. This is dyed-in-the-wool, categorical impeachment information. The fact that an attorney, and I think we had every right to be disclosed this information, yet we weren't. How does that change the theory of the defense case? You already come into the case with a CI who's being used cooperating, and you've got all the same bias impeachment information available. I don't know how the theory of the case really changes, or how the cross-examination changes in that ultimately, with time, you were able to ask further questions on this. There's really two things there you could address, if you wouldn't mind. I'll try to. To some extent, the court is correct. Your Honor's point is well taken in the sense only that, yes, we were able to resume cross-examination. However, we were never given full disclosure. As far as the theory of the case is concerned, I think that's really the critical point. The theory of the case going into that trial, for what it was worth, was lack of identification of the defendant as being the person who the informant said he was. In reading through the briefs, there was a shift. They thought he was one person, and then later he was arrested on a different offense. Years later, after the operation had concluded, then the informant said, that was the guy I originally thought was that guy. So that was the operating defense theory. The disclosure, the substance of the disclosure, wasn't just that this man was paid by the DEA from the years 2005 to 2008, as it were. It's actually the facts are what is really important, not the fact that he was an informant, not the fact that he was paid. We already knew that, and any competent attorney is going to cross-examine a government witness with that information. So the court is correct. To that extent, it just furthered that impeachment. But that's not the theory of the case. The actual substance of the work that this man did for DEA, two years prior to the work he was doing for OCDETF, Organized Crime Drug Enforcement Task Force, in this case, is almost identical to the operation. And that, we weren't able to ever elaborate upon. He, in this case, procured a tractor-trailer, drove it into Mexico, had it loaded through his contacts in Mexico, then drove the load into the U.S., and the operation, to sum it up, was to draw people out of the shadows. That's exactly what he did in the 2008 case for the DEA. He got a, in that case, it was a commercial dump truck and did the exact same thing. Now, if this, in particular, informant's MO, if you will, is to do this operation in the midst of his pretty sizable drug-trafficking enterprise of his own, where he was making upwards of $100,000 for each bulk cash run, I believe making about half a million for each marijuana load he drove to Detroit and that he drove to Baltimore. Now in the midst of this, he goes and sits down with DEA or any informing agency and he's absolved of his sins, A, and more importantly, B, he conducts the exact same operation. To quote the district court, it essentially took weeks, if not probably months, of trial preparation and condensed it down into an afternoon. And that's the error. There needed to be a mistrial so that that information could be factored into the theory of the case, but more importantly, trial preparation in general. By that, I mean formal requests of the government to disclose. I mean motions to compel filed with the district court. I mean subpoenas. I mean calling witnesses. And I mean crafting a much different theory of the case. And we weren't able to do that. The government didn't disclose this information that it needed to disclose. What's more important is that the Homeland Security handlers of this informant testified that they vetted the informant when he signed up with HSI. To the extent that that information, being that he was a DEA informer just two years prior, paid money, ran a huge operation into the suspected members of the drug cartel, and he just plum forgotten didn't mention that while he's being vetted to his Homeland Security handlers, we would need disclosure requests into that entire process. Was there any reason why you couldn't have recalled those agents to point that out to them? I mean it seems to me you could have made them look really bad on the stand under your theory of the case. We had already completed the interviewing of, I'm sorry, the cross-examination of those particular witnesses, but there's other witnesses that we would have needed to flesh out. Again, we were committed to our theory of the case that we had started with from the start, and we were left in an impossible situation because that's what a mistrial is for, is to prevent a manifest necessity. What happened was the district court tipped its hat to those concerns and then did not allow the mistrial to be declared, which was what was necessary to prevent the manifest necessity from occurring. You were part of the trial team, is that correct? That's correct. Having read the transcript, I thought you and Mr. Hernandez did a very good job of making this guy look like a sleazy, not-to-be-trusted DEA slash HSI informant. I thought that was actually very effective. I compliment you, but at the same time that raises the question of what, I'm trying to understand, for example, in your closing, how would your closing have been different had this information been disclosed, which it should have been. There's no doubt about that in my mind. Tell me how it would have been different. It would have been an entirely different trial. It's not that the particular questioning of a particular person would have gone one way or another, or the closing would have differed. The entire case would have been put on differently had that information been known and been able to, we could have hired an investigator to track down those things, find the, we don't know did this person testify before a grand jury. He did make, once I spoke in front of a large room, there was a prosecutor there and there were a lot of people there but no defense attorneys. That to me sounds like a grand jury. I don't have any of that information. There was some indication of immigration benefits that may have been conferred for his wife. I don't have that information. So to the extent that there was some effective cross-examination, I would submit it would be even more effective, to borrow the Court's phrase. And beyond that, the closing would have been different because the case would have been put on differently. If this man's M.O. is to go before the Federal Government and is absolved of his sins, paid for his troubles, and then conducts a very similar operation two years prior that I don't believe resulted in any arrest, although I don't know, I'd like to know that. And I think I have a due process right to know that, to confront him, to cross-examine him, and more importantly, to craft my theory of the case. And I have four minutes left, so I'd like to reserve that time. Thank you. We'll hear from the government. May it please the Court. Counsel, my name is Reese Bostwick and I represent the United States of America, the appellee in this case. Let me address, if I can, a few of the issues that you brought up with counsel. First of all, the statement that it's not clear that immigration benefits were obtained for the wife, that was clearly addressed on cross-examination and it was made clear no immigration benefits were obtained. In fact, the witness testified that they hired an attorney and because of how long the passage of time was, they had gone with that attorney and gotten her naturalized. So there were no immigration benefits. And what they latch on to is that it was approximately 19 months. It was basically from April of 2003 to January of 2007 that this person provided information. No cases were made. There were no arrests. The only arrest that occurred was a fugitive that the witness learned about and advised the DEA agents and they went out and arrested the person and the witness was provided benefits, money for that information. That was all brought out on cross-examination. To the extent that counsel was asked and said, well, we didn't get a chance to cross-examine these witnesses, the record reflects that after the documents were disclosed, the CI was cross-examined extensively concerning those documents, but also the HSI control agent, the agent that controlled, he was also cross-examined concerning those documents, that cooperation, what he knew about it, what information he knew of, and any benefits that he was aware of provided. Additionally, a record was made that there were no cases made, there were no people arrested, and the benefits that were disclosed to counsel, they were able to cross-examine the witness about that. So from our perspective, there wasn't a Brady violation, number one, because the evidence was disclosed, and number two, defense wasn't prejudiced by it because they were able to make extensive use of that information. The previous work with the DEA that was disclosed mid-trial, was that working with the agents in Phoenix, DEA agents in Phoenix? In Tucson, I think. In Tucson. I say I think because the documents, if you review them, concern information that was provided about Tucson activities. And I think the redacted documents as well as unredacted documents have been submitted to this Court in camera. And if you review them, the gist of that cooperation is this informant reporting to DEA, I was contacted about somebody they want me to provide transportation of marijuana. I've been told that this individual is involved in the smuggling or transport or distribution of marijuana. And so that was the type of information that was being turned over. To the extent that the cooperation at that time tried to result in arrest, there was one instance, again, where the witness was approached and asked to provide transportation. That's what he did. He provided a transportation network. And they tried to get that to work. A quantity of money was provided by people that the witness had been approached by. They purchased registration and items for a truck to arrange for the transportation, but it never occurred. And if you look through those documents, you see that a portion of the money that wasn't spent was actually returned to the prospective defendants, if you will. The money was given back to them. So all that information was in those records. It was available. And to the extent that defense cross-examined the witness, and I understand their strategy, some of the minutia of what was there just didn't matter. If you look through all those pages of reports, some of it is quarterly report, depriving of CS, we'll continue to keep advised of information, things of that nature. So there was nothing there that, based on this information, they made a big case, he testified at trial, and here's the results, and he got a large sum of money. So it was different than what actually occurred in this case. And if you look at the facts of this case, the informant wasn't the main witness as far as convicting the defendant. He was very involved in the basic component for making the case, but that's because he was approached and asked to first transport money, and DPS turned him over to HSI. HSI said, go ahead and do that just to see if you're for real because of the amounts you're talking about. He did that. He then came back and he said, now I'm getting approached again, transport a large quantity of marijuana. They said, okay, go ahead and go to these meetings. Go ahead and talk to these people so, as counsel said, we can draw them out. We can find out what's involved in the organization. The informant authorized his phone to be tapped. His calls were recorded, and in part, that was the very strong evidence against the defendant. It was his own phone calls to the co-operator trying to set up a stash house in Southern California, trying to set up a warehouse in Southern California. They surveilled meetings where the informant met with the defendant and other co-conspirators. From some of those meetings, after the first money was paid in late July, they followed the person that delivered the money away. That's how they discovered the warehouse in Chino, California. That vehicle was then followed to a house in La Fontana. That's how they discovered the money stash house in Southern California. As part of that investigation, they were identifying locations, they were identifying people, and probably as important as anything is that the defendant sat by with the informant while the marijuana, and it turned out to be over 9,000 pounds, that was brought into the United States and then taken to the warehouse in Chino, after that was delivered, the defendant got the call that the marijuana has been delivered. At that point, he paid the informant. The defendant paid the informant almost $200,000 as partial payment for a verain to transportation. So that's the type of strong evidence that the defendant would have had to overcome, and it's submitted in our brief that this small 19-month of reports that was disclosed, that defense counsel made use of, that was able to cross-examine both the informant as well as the controlling agent, were cumulative to the bigger picture of the monies that were paid to the defendant by the government for this case, and also to the, the jury knew. The jury knew from the get-go that this person that was an informant shouldn't be relied on, that he'd been paid, that he'd worked off charges in the late 1980s, he'd been charged with one kilogram of cocaine, he'd pled to money laundering and got five years' probation and six months' health arrest. That all came out, so all that information was before the jury. The complaint of the defendant is that the jury did not substitute the argument by defense for the evidence that was independent of the informant, and that evidence was overwhelming. I guess one question I have, and I appreciate your argument, is just how does this happen in this respect? The information was available as this informant. Someone ran a database search in Washington or somewhere, and this information pops out in the computer. I remember, I was a prosecutor for a long time, so I remember. So if you can kind of explain how HSI doesn't know that DEA is paying this guy just, you know, four or five years before the incidents in question. I mean, just procedurally, how does that happen? I think it happens at the time, and again, you're asking me how I think that happened, because I mean, the record's there for what occurred. The control agent was asked specifically if he knew about it, and he said, no, I didn't know. He said, I asked him if he was currently signed up, and he said, no. The government had previously disclosed the cooperation for DEA when the informant worked off that first charge, and I think beyond that, nobody thought to say, well, what else is out there, because of the fact that the informant had been working for DPS, and was actually turned over to HSI by DPS. So they knew about the prior conviction. I think that probably showed up in a priors check, and they disclosed that information. They knew that he'd come from DPS, and so they disclosed all that information, and then they disclosed what they knew about. So anything they knew about, I think they disclosed. If your question to me is, well, why didn't they find this, I don't have an answer for that, But he did have a NATIS number, didn't he? I would imagine he had a NATIS number, but I just, I don't know enough about the procedure if you ran a NATIS, if that would have come up, as it was, the counsel in our office that had to go back, basically, through chief counsel in Washington, D.C., to have somebody, I think, like do a manual check to find the file under this guy's informant number, and once they found that, the delay was getting those documents. Once those documents were disclosed, and again, the description by the defendants about how they had those, if you read the transcript, those documents were provided to the judge, and the judge authorized the redaction, which the case law allows. Once those were disclosed to defense, the trial judge even said, you know what, we're going to recess Friday today at about 11 in the morning. Counsel, you've got the rest of the day, you've got all weekend, and Monday, we won't start until 1 in the afternoon. And certainly, I have no problem how the district court handled this issue. I guess where I have the concern is that this information about an informant, now, maybe it's not the biggest secret in the world, but you could imagine a case where there's something much more serious about the informant, and it's only found because of some random comment the witness makes on the witness stand and a manual check being performed in Washington. I'm just curious, as the office, have procedures changed at all? I mean, look, this could have been much, much worse than it was. Frankly, you guys are lucky that this was merely could be viewed as cumulative. I mean, this guy could have killed somebody, and that could have gotten maybe because someone didn't do the manual check on the computer. So I'm kind of wondering what, going forward, how this doesn't happen again. I will tell you, not even a result of this case, but prior to this, our office, and not in concert with investigative agencies because they don't necessarily approve it, but our office prior to this has implemented and put into place a procedure for basically vetting all potential informants. And that is done through one of the senior supervisors. See, there's senior attorneys in the office or one of the supervisors in the office. Sometimes the supervisors aren't senior, but somebody in authority to vet all potential informants. So if an agency comes to us, it doesn't matter if it's HSI, FBI, DEA, ATF, and says, we've got this informant that wants to write information, we now go through a more thorough vetting process and require information about any criminal history. But it's more extensive. I mean, potential drug use, instances of dishonesty, any time they previously testified, any other time they provided information, any time they've been an informant, any payments they've received. I mean, anything you could literally think of, if you looked at all the various cases about things that have popped up, that is in place just to try and avoid this type of situation. This case certainly wasn't the impetus for that, but the events that occurred here were in 2010. This trial wasn't until 2013. I've got three minutes. If you want me to address this more, I can. I could go all day. I'd like to briefly discuss the sentencing issues, if you have any questions about that. The judge at trial made a pretty good record at sentencing about the two-point enhancement for the firearm, the three-point enhancement for the managerial role. That's for clear error. It was supported by the evidence. I mean, her findings are sound in that regard. And as far as the acceptance of responsibility that defense tried to raise in their reply brief, our position is that they abandoned that, because in their opening brief, they list that as one of the three sentencing issues, but they never, ever discuss it. To the extent, if you want me to address it, they went to trial, they denied guilt, they tried to claim that it was the wrong person, they weren't there, that they weren't involved. And then after arrest, he said, I was even just a money courier. And quite frankly, the court found that the evidence was much greater than that, and so rejected that as well. But for those reasons, we believe that the judgment and conviction in the sentence in this case should be affirmed. Thank you very much. Thank you, counsel. Thank you. We'll hear rebuttal. The main takeaway here is that we don't know. We still don't know what else is out there. The government didn't discharge its duty under Brady. They did not disclose exculpatory information. It's that simple. There could be, to use the court's hypothetical, there could be a murder out there. There could be, I don't know. The point is, a thorough check wasn't done, and we were not provided full and complete disclosure, as we're entitled to. And I also think that the government's sort of whistling past the graveyard with regard to the facts. They're talking about the facts of the case and this, that, and the other, but it has nothing to do with Brady. The evidence could be overwhelming, but the government still has a duty to disclose, you know, payments that an informant was, it was provided by the government, who they're now calling, and he, this man was instrumental in putting the case together, and it was his identification of the, of the defendant. It was his identification. He was sent in under, undercover, essentially, into the jail where my client was held, and then came out and said, yeah, that's the guy. So this, this, this was a instrumental witness for the government. He was, it's not a cumulative analysis. I also think it's important that when the judge was, was about to declare a mistrial, the government had no problem in producing the documents. None whatsoever. So it's not as though this was undiscoverable. It was very easily discoverable. They just didn't do their job. And if there is a new process that, that government counsel is just describing about vetting these witnesses properly, Mr. Lopez-Rivas should be entitled to a trial where that procedure is followed. The last thing, just to, just to touch briefly on the sentencing issues, as far as the briefs are concerned, it's a public record, and so is what I'm saying now. I don't want to betray any client confidences, but the reason that the plea agreement was simply not possible was there was fear of, legitimate fear of violence, and that's why the trial went forward the way it did. I can't say any more than that. I will say that other witnesses were, went to trial. There is nothing in the guidelines or any opinion of this circuit that suggests that simply going to trial, he did not take the stand, simply going to trial and putting forth a defense is a bar to acceptance of responsibility. He did accept, and the PSR, which is, was submitted to the court, did specifically say he accepted guilt and he, he agreed with the, the jury verdict for the purposes of sentencing. It wasn't, it wasn't simply saying, I'm innocent, I didn't do it. It was just that he went to trial, and there's nothing in the guidelines that prevents that. Yet the briefing that you did on this was pretty slim, and so you're asking us essentially now to go back and consider all of this by way of the reply. Well, no. I, I explained why it's as, was as scant as it was. To the extent the district court, and that's contained in the briefs, to the extent the district court relied on him going to trial as the reason that it did not impose or allow the acceptance of responsibility enhancement, that alone is error. But she didn't do that. She articulated specific reasons why she felt acceptance would not be appropriate in this case. But that analysis relied heavily upon the notion of having gone to trial. And to the extent that that's an invalid argument, that's an invalid reason, justification for that denial. That, that is why it was raised the way it was. I, I just, for the reasons I said, I can't really go into any further. It just had to do with fear of his life as to why he went to trial. Beyond that, I will just re-urge all the arguments contained in the pleadings. I'd ask the court to vacate the conviction and remand this case for a new trial. And I appreciate, it was  Thank you, counsel. Thank you both for your arguments this morning. The case has heard will be submitted for decision.
judges: Thomas, Owens, Bataglia